AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Louisiana

**SEALED**

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>IN THE MATTER OF A SEARCH OF INFORMATION<br>THAT IS STORED AT PREMISES CONTROLLED BY<br>INTERACTIVE TECHNOLOGY SERVICES, LLC | )<br>)<br>)<br>)<br>)<br>)<br>Case No.  20-MC-349 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Northern_____ District of _____Georgia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. 1347 | Health Care Fraud |
| 18 U.S.C. 1343 | Wire Fraud and Mail Fraud |
| 18 U.S.C. 1349 | Conspiracy to Commit Health Care Fraud and/or Wire Fraud |
| 18 U.S.C. 371 | Conspiracy to Defraud the United States and to Pay and Receive Healthcare Kickbacks |
| 42 U.S.C. 1320a-7b | Offering and Paying Kickbacks Involving a Federal Health Care Program |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of **30** days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Victoria Buono, HHS-OIG/OI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____02/03/2020_____

_____
*Judge's signature*

City and state: _____New Orleans, Louisiana_____

Hon. Joseph C. Wilkinson, Jr., U.S. Magistrate Judge
*Printed name and title*

# SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF A SEARCH OF
INFORMATION THAT IS STORED
AT PREMISES CONTROLLED BY
INTERACTIVE TECHNOLOGY
SERVICES, LLC

NO. 20-MC-349

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

Your Affiant, Special Agent Victoria Buono, being duly sworn, deposes and says as

follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the U.S. Department of Health and Human Services,

Office of Inspector General's Office of Investigations (HHS-OIG/OI).  I have been employed in

this capacity for approximately 8 months.  I am presently assigned to investigate a wide variety of

health care fraud matters, including schemes to defraud Medicare and Medicaid. In this capacity,

I am authorized to conduct investigations into criminal violations committed against the United

States, including, but not limited to health care fraud, payment and receipt of illegal health care

kickbacks, making false statements in connection with a health care benefit program, and related

conspiracies.  I am authorized to apply for and execute arrest warrants for offenses enumerated in

Titles 18 and 42 of the United States Code, and to execute search warrants. Prior to my law enforcement career, I was employed as a program analyst for the U.S. Department of Homeland Security, Office of Inspector General. I have received training in investigating various types of criminal activity, including fraud, at the Federal Law Enforcement Training Center in Brunswick, Georgia and the HHS-OIG/OI training center in Largo, Maryland.

2.      I make this affidavit in support of an application for a search warrant for information associated with KHALID SATARY ("SATARY"), Lazarus Services, LLC ("Lazarus Services"), Clio Laboratories, LLC ("Clio Labs"), Performance Laboratories, LLC ("Performance Labs"), Alpha Medical Consulting, Inc. ("Alpha Medical Consulting"), Elite Medical Labs, Inc. ("Elite Labs"), and related entities, as described in the following paragraphs and in Attachment A (attached hereto and incorporated as if fully set forth herein). The information the government seeks to search is stored on computer servers located at a premises owned, maintained, controlled, or operated by Interactive Technology Services, LLC ("Interactive Technology Services"), an electronic communication services company that provides laboratory information management systems ("LIMS"), lab outreach and patient outreach portals, and document management portals to healthcare providers, headquartered at 11380 Southbridge Parkway, Suite 234, Alpharetta, Georgia. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Interactive Technology Services to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts identified in Attachment A, including the contents of communications.

3.     On September 26, 2019, SATARY was indicted by a grand jury sitting in the Eastern District of Louisiana based on allegations substantially similar to those contained in this affidavit. *See United States v. Khalid Satary*, Crim. No. 19-197, Section "D" (E.D. La. Sept. 26, 2019) (DE 1).  The indictment charged SATARY with one count of conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; three counts of health care fraud, in violation of Title 18, United States Code, Section 1347; one count of conspiracy to defraud the United States and to pay and receive illegal health care kickbacks, in violation of Title 18, United States Code, Section 371; and one count of conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h).   On September 25, 2019, search warrants to search the business premises of Clio Labs, Performance Labs and Lazarus Services were obtained in the Northern District of Georgia, Western District of Oklahoma and Eastern District of Louisiana, respectively, where each business was respectively located.  The search warrants were executed simultaneously with SATARY's arrest on September 27, 2019.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that from in or around January 2017, and continuing through the present, in Orleans Parish, in the Eastern District of Louisiana and elsewhere, SATARY, through Lazarus Services, Clio Labs, Performance Labs, Alpha Medical Consulting and Elite Labs, violated Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and/or Wire Fraud); Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay and Receive Healthcare Kickbacks); Title 42, United States Code, Section

1320a-7b (Offering and Paying Kickbacks Involving a Federal Health Care Program); and Title 18, United States Code, Section 1956(h) (Conspiracy to Commit Money Laundering).

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  As set forth below, acts in furtherance of the offenses under investigation occurred within the Eastern District of Louisiana, including the submission of fraudulent claims to Medicare for laboratory services that were not medically necessary and that were procured through unlawful kickback payments. *See* 18 U.S.C. § 3237(a); 18 U.S.C. § 2711(3)(A)(i).

## THE MEDICARE PROGRAM

6.      The Medicare Program ("Medicare") is a federally-funded program that provides free and below-cost health care benefits to people age 65 years or older, the blind, and the disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program.

7.      Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."  Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

4

8.     "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries. In order to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare. Specifically, the certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

9.     Medicare will not pay claims procured through the payment of kickbacks.

10.    A Medicare "provider number" is assigned to a provider upon approval of the provider's Medicare application. A provider may use that provider number to file claims with, or "bill," Medicare to obtain reimbursement for services rendered to beneficiaries. When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

11.    Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

12.    Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions JH and JL, which included Louisiana, Mississippi, Oklahoma, Texas, and

5

Pennsylvania. Palmetto GBA ("Palmetto") was the MAC for consolidated Medicare jurisdictions JJ and JM, which included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia. Novitas and Palmetto received and adjudicated claims in Mechanicsburg, Pennsylvania and in Columbia, South Carolina, respectively. Thus, electronic claims submitted to Novitas and Palmetto from laboratories in Louisiana, Oklahoma, and Georgia were necessarily interstate wire communications.

<u>**MEDICARE COVERAGE FOR CANCER GENETIC TESTING**</u>

13.     This investigation concerns claims submitted to Medicare for Part B laboratory services, namely, cancer genetic testing ("CGx testing"). CGx tests are a type of testing that use DNA sequencing to detect mutations in genes related to cancer. CGx tests do not identify whether a beneficiary has cancer. Rather, CGx tests can identify whether a beneficiary has certain genetic mutations that might put them at increased risk of developing cancer in the future. If a beneficiary has been diagnosed with cancer, CGx tests can also provide information to the beneficiary's treating physician about the type of cancer the beneficiary has, as well as what treatment options might be available to treat that cancer. Medicare reimburses for the test at rates varying from approximately a few hundred dollars to over $6,000 for a panel of tests.

14.     Congress statutorily excluded Medicare from covering diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions

Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

15.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing.  Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem."  "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

16.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.  Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## ENTITIES AND INDIVIDUALS

17.     Lazarus Services is a Medicare provider with a principal place of business in Orleans Parish, Louisiana, that purports to provide genetic testing to Medicare beneficiaries.

18.     Clio Labs is a Medicare provider with a principal place of business in Gwinnett County, Georgia, that purports to provide genetic testing to Medicare beneficiaries.

19.     Performance Labs is a Medicare provider with a principal place of business in Oklahoma County, Oklahoma, that purports to provide genetic testing to Medicare beneficiaries.

20.     Based on interviews with witnesses and bank records obtained through grand jury subpoenas, I know that SATARY is the true owner and operator of Lazarus Services, Clio Labs, and Performance Labs, collectively, the "SATARY LABS."

21.     Alpha Medical Consulting is a company with a principal place of business in Gwinnett County, Georgia, that purports to provide consulting services to laboratories. Based on interviews with witnesses and bank records obtained through grand jury subpoenas, I know that SATARY controls and operates Alpha Medical Consulting.

22.     Elite Labs is a company with a principal place of business in Gwinnett County, Georgia, that purports to provide genetic testing to Medicare beneficiaries. Based on interviews with witnesses and bank records obtained through grand jury subpoenas, I know that SATARY is the true owner and operator of Elite Labs.

23.     Company 1 and Company 2 are companies incorporated under the laws of Georgia. According to incorporation records filed with the Georgia Secretary of State, Individual 1 was the owner of Companies 1 and 2.

24.     Company 3 is a company incorporated under the laws of Florida, with its principal place of business in Fort Lauderdale, Florida. According to incorporation records filed with the Florida Secretary of State, cooperating witness 1 ("CW 1") was the owner of Company 3, and cooperating witness 2 ("CW 2") was an employee of Company 3. After being approached by federal agents, CWs 1 and 2 admitted their criminal conduct and began cooperating in the hopes of receiving a recommendation from the government for a lesser sentence.

25.     Company 4 is a company incorporated under the laws of South Carolina. Individual 2 is the owner of Company 4.

8

26.    Individual 1, Individual 2, CW 1 and CW 2 had no medical training, and were not medical professionals.

27.    Company 5 is a company incorporated under the laws of Florida, with its principal place of business in Loxahatchee, Florida.  Company 5 purports to provide telemedicine services to the public.

28.    Company 6 is a company incorporated under the laws of Florida, with its principal place of business in Tampa, Florida.  Company 6 purports to provide telemedicine services to the public.

29.    Cooperating witness 3 ("CW 3") is a resident of Madisonville, Louisiana.  Since approximately 2017, CW 3 served as the Chief of Operations of Company 7, a Mississippi-based clinical laboratory, and, as of approximately January 2019, CW 3 served as the interim Chief Executive Officer of Lazarus Services.  CW 3 is the relator in a *qui tam* filed in the United States District Court for the Southern District of Florida, alleging, among other things, that the SATARY LABS have caused false and fraudulent claims for CGx testing to be submitted to Medicare.

30.    Cooperating Witness 4 ("CW 4") is a resident of Palm Beach County, Florida.  CW 4 was a marketer for the SATARY LABS.  After being approached by federal agents executing a search warrant for CW 4's cellular phone, CW 4 admitted his/her criminal conduct and began cooperating in the hopes of receiving a recommendation from the government for a lesser sentence. CW 4 was not a medical professional, and had no medical training.

## PROBABLE CAUSE TO BELIEVE A CRIME HAS BEEN COMMITTED

31.    The SATARY LABS are laboratories owned by SATARY.  Between in or around January 2017 and September 2019, Clio Labs billed Medicare approximately $71 million to Part B, of which approximately $16 million was paid.  $57 million of that billing (or approximately

80%) was for CGx testing. Of the $16 million Medicare paid for all of Clio Labs's testing, approximately $15 million (or approximately 93%) was for CGx testing.

32.    Between in or around January 2017 and September 2019, Performance Labs billed Medicare approximately $369 million to Part B, of which approximately $114 million was paid.[1] $368 million of that billing (or approximately 99%) was for CGx testing. Of the $114 million Medicare paid for all of Performance Labs's testing, nearly 100% of it was for CGx testing.

33.    Between in or around January 2017 and September 2019, Lazarus Services billed Medicare approximately $13 million to Part B, of which approximately $3.2 million was paid.[2] $12.6 million of that billing (or approximately 96%) was for CGx testing. Of the $3.2 million Medicare paid for all of Lazarus Services's testing, nearly 100% of it was for CGx testing.

34.    As described below, SATARY used Alpha Medical Consulting to pay marketers illegal kickbacks and bribes, via cash, check and wire transfer, in exchange for CGx tests and doctor's orders authorizing the tests.

THE SCHEME

35.    Federal agents obtained bank records through grand jury subpoenas for the SATARY LABS's corporate accounts, including Clio Labs, Performance Labs, and Lazarus Services, that received the Medicare reimbursements, as well as other SATARY-controlled accounts to which SATARY subsequently transferred the Medicare reimbursements. According to those records, SATARY directly or indirectly transferred tens of millions of dollars to Companies 1, 2, 3 and 4, as described below. Based on my investigation and conversations with other law enforcement officers familiar with this investigation, and as explained in greater detail

---

[1] Between 2017 and May 2018 – the period before which Performance Labs' billing spiked in June 2018 and SATARY obtained control of Performance Labs – it billed Medicare for approximately $1,764,887.
[2] Between 2017 and the end of 2018 – the period before which SATARY obtained control of Lazarus Services – it billed Medicare for approximately $695,363.

below, I know that Companies 1, 2, 3, 4, as well as CWs 1, 2, 4 and Individuals 1 and 2, used call centers and "health fairs" to market genetic testing kits aggressively to Medicare beneficiaries, without regard to whether beneficiaries have cancer or symptoms of cancer that their treating physician has decided need to be treated. The SATARY LABS then paid Companies 1, 2, 3, 4, as well as CWs 1, 2, 4 and Individuals 1 and 2 illegal kickbacks in exchange for the beneficiaries' from whom they had obtained DNA samples.

36.     I also know that Companies 1, 2, 3, 4, as well as CWs 1, 2, 4 and Individuals 1 and 2, contracted with telemedicine companies who provided doctors to perform "telemedicine" consultations with Medicare beneficiaries in order to justify the issuance of a doctor's order for these items. I know that these doctors were not treating the beneficiaries for any specific medical problem, and, in some cases, did not actually perform the telemedicine consultation with the beneficiaries. Instead, the contracts were sham contracts designed to disguise the illegal kickbacks and bribes. In reality, Companies 1, 2, 3, 4, as well as CWs 1, 2, 4 and Individuals 1 and 2, purchased signed doctor's orders from the telemedicine companies. And in exchange for an illegal kickback and bribe, the doctors authorized the tests without conducting valid examinations of the beneficiaries. I also know that Companies 1, 2, 3, 4, as well as CWs 1, 2, 4 and Individuals 1 and 2, sold the completed genetic testing kits and doctor's orders (known in the industry as "D.O.s") to the SATARY LABS in exchange for illegal kickbacks and bribes.

37.     I also know that in or around February 2005, SATARY was sentenced to five years' imprisonment after pleading guilty before the United States District Court for the Northern District of Georgia to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. §371; one count of trafficking in counterfeit phonorecord labels, in violation of 18 U.S.C. § 2318(a) and (c)(3)(2); and one count of copyright infringement, in violation of 17 U.S.C. § 506(a) and 18

11

U.S.C. § 2319(a) and (b)(1) and (2). As described below, I know that SATARY placed the ownership of the SATARY LABS, including Performance Labs and Lazarus Services, in the name of nominee owners, including a close relative ("Individual 3"), even though SATARY himself was the true owner of the SATARY LABS. Based on my training and experience, I know that Medicare would not have paid the claims submitted by the SATARY LABS had it known that SATARY failed to disclose his ownership and control over the SATARY LABS in Medicare enrollment applications.

Clio Labs

38.     Based on records on file with the Florida Secretary of State, Clio Labs was formed in Florida on or about June 2, 2015, with a principal place of business in Lake Worth, Florida. Individual 4 was listed as the sole manager of the company. According to records obtained through grand jury subpoena, Clio Labs opened a corporate account at Wells Fargo in or around July 2016. Individual 4 was the sole signatory on the account. According to records obtained from Medicare contractors, on or about January 16, 2017, Individual 4 signed an application to enroll Clio Labs as a Medicare provider.[3] Clio Labs received a Medicare provider number shortly thereafter.

39.     According to Medicare claims data, Clio Labs submitted its first claim to Medicare in or around January 2017. Between January 2017 and July 2017, Clio Labs submitted approximately $310,619 in claims to Medicare. Between August 2017 and December 2017, Clio Labs submitted approximately $12.8 million in claims to Medicare.

40.     According to records obtained through grand jury subpoena, on or about February 1, 2018, Clio Labs opened a corporate account at Wells Fargo. Individual 4, SATARY, and

---

[3] The date in the enrollment form is January 16, 2016. However, based on the date the enrollment was submitted, the "2016" date appears to be a typographical error.

another individual were the signatories on the account. According to Medicare claims data, between January 2018 and June 2018, Clio Labs submitted approximately $60 million to Medicare.

41.     A review of the bank records for Clio Labs's corporate accounts shows that in 2017 and 2018, Clio Labs paid Companies 1 and 2 at least approximately $3.1 million. In the same time period, Companies 1 and 2 paid Company 3 approximately $80,000. CWs 1 and 2 (the owner and an employee of Company 3), have admitted their criminal liability and are cooperating in this investigation in the hopes that the government might request that they receive lesser sentences. According to CWs 1 and 2, Company 3 utilized call centers in Pakistan, India, and the Philippines to generate Medicare beneficiary leads, and used LinkedIn to find the call centers.

42.     According to CW 5, a former employee of Company 3 interviewed by federal agents in or around November 2018, employees at Company 3 were instructed to sell genetic testing kits to beneficiaries. According to CW 5, employees at Company 3 were instructed to ask beneficiaries if they ever had cancer personally, or whether anyone in their family had been diagnosed with cancer. If the answer to either question was "yes," (even if the answer to whether the beneficiary had ever had cancer personally was "no,"), the beneficiary was considered qualified to receive a genetic testing kit. As explained *supra*, this is inconsistent with Medicare's rules and regulations and would result in patients being deemed "qualified" who did not meet Medicare's guidelines. In addition, CW 5 also said that s/he was instructed to force products on beneficiaries, force beneficiaries to stay on the phone, and develop fake medical necessity for products. CW 5 was not a medical professional, and had no medical training.

43.     According to CW 1 and CW 2, if a beneficiary indicated that they had either a personal diagnosis of cancer or a familial cancer diagnosis and agreed to receive the genetic testing

kit, Company 3 shipped the testing kit to the beneficiary.[4]  Upon confirmation of delivery, a Company 3 employee would call the beneficiary with step-by-step instructions for the swabbing test.  The beneficiary would then mail the completed swab back to Company 3.

44.     According to CWs 1 and 2, Company 3 then sold the completed swab to the Companies 1 and 2 without a completed D.O., using a "marketing" contract to disguise the illegal kickbacks and bribes.  According to a contract between Company 1 and Company 3, which was obtained in response to a grand jury subpoena and dated February 20, 2018, Company 1 paid $1,500 to Company 3 for each comprehensive cancer genetic test, $1,000 for each colorectal/pancreatic cancer genetic test, $400 for each BRCA1/BRCA2 genetic test, and $100 for each pharmacogenomics test.

45.     According to CW 2, after receiving the completed swab and beneficiary information from Company 3, Companies 1 and 2 obtained a D.O. for the completed swab from Company 5.  According to a March 21, 2018 contract between Companies 1 and 2 and Company 5, which was obtained pursuant to a grand jury subpoena, Companies 1 and 2 would pay $35 an hour to Company 5 for "third-party physician concierge management services."  In reality, CW 2 stated, s/he was purchasing doctor's orders.

46.     According to records obtained through search warrants and a review of bank records, Companies 1 and 2 had this same business relationship with several other companies, each of which is known in the industry as a "downline" of Companies 1 and 2.

47.     In February and March 2019, agents interviewed doctors who authorized genetic testing through Company 5.  Two of the medical providers hired through Company 5 reported that they never contacted the beneficiaries after the genetic testing was completed to go over the results

---

[4] DNA samples were collected from beneficiaries primarily through a "buccal swab," which is a manner of collecting DNA from the inside of a person's cheek using sterile swabs with cotton tips.

with the beneficiary. The third provider stated that s/he contacted only 25-30% of the beneficiaries to go over the results. Instead, the medical providers stated that Company 5 informed them that the results would be sent to the beneficiary's primary care physician, who would discuss the results. The medical providers did not explain why beneficiaries with a primary care physician would need a telemedicine doctor to order the genetic testing, rather than having the primary care physician order the testing. None of the Company 5 doctors had specific training in genetics or genetic testing.

48.     In addition, the government obtained through a search warrant thousands of D.O.s sent to Company 5 for signature. A review of the D.O.s showed that the beneficiary signatures on the D.Os. pre-dated the signature of the ordering physician, meaning that testing was ordered *after* a testing kit was shipped to and completed by the beneficiary. However, the normal course of medical practice would be for a medical provider's authorization for a test to be the first step in a beneficiary receiving a test. This backwards practice further calls into question the medical necessity of the genetic testing ordered.

49.     Relying on records obtained pursuant to grand jury subpoenas and through search warrants, federal agents were able to identify beneficiaries for whom Clio Labs submitted claims to Medicare for CGx, and whose DNA samples and D.O.s were obtained through the network of Companies 1, 2, 3 and 5 described above.

50.     Between November 2018 and August 2019, law enforcement agents interviewed approximately ten beneficiaries for whom Clio Labs submitted claims for CGx. The beneficiaries stated that they were contacted by telemarketers offering CGx or attended health fairs or cancer screening seminars where representatives of CGx marketing companies marketed the benefits of completing CGx. All but one of the beneficiaries did not know or recognize the name of the

physician who ordered the CGx, nor did he/she consult his/her primary care physician concerning the CGx. For example, on January 10, 2019 agents interviewed J.P., a beneficiary who attended a cancer screening seminar with his/her spouse at their local synagogue. During the seminar, marketing representatives spoke with them about the benefits of cancer screening, walked them through a self-administered CGx test and provided them with a complimentary lunch. According to Medicare data, Clio Labs submitted approximately $23,982 in claims for J.P., and approximately $27,729 for J.P.'s spouse.

51.     According to bank records obtained pursuant to grand jury subpoenas, between 2017 and 2018, Clio Labs paid Companies 1 and 2 approximately $3.1 million. Companies 1 and 2 paid Company 5 approximately $112,000 in the same time period. And in the same time period, Companies 1 and 2 paid Company 3 approximately $80,000.

Performance Labs

52.     According to records obtained through grand jury subpoena, on or about March, 12, 2018, an employee of Clio Labs sent an email stating that it would no longer be able to accept DNA samples from beneficiaries who had only a family history of cancer, rather than a personal history of cancer, due to a change in reimbursement rules by Palmetto, the MAC that adjudicated claims for Clio Labs.

53.     In or around June 2018, just a few months after Clio Labs announced it was no longer accepting "family only" CGx tests, the billing of Performance Labs spiked dramatically. Specifically, Medicare data shows that Performance Labs billed Medicare $833,151 in May 2018. In June 2018, it billed $4,433,604 to Medicare. Between June 2018 and December 2018, Performance Labs submitted approximately $98,394,965 in claims to Medicare. Between January

2019 and June 2019, Performance Labs submitted approximately $263 million in claims to Medicare.

54.     Records described below establish that SATARY obtained control of Performance Labs in this timeframe, and began billing CGx samples through Performance Labs instead of Clio Labs.  As explained below, SATARY did this because Novitas – the MAC that adjudicated claims for Performance Labs, which was in Oklahoma – did not reject claims for "family only," even though such practice was inconsistent with Medicare reimbursement rules.

55.     Specifically, as noted, CW 3 is the interim CEO of Lazarus Services and has filed a *qui tam* relating to SATARY and the SATARY LABS.  Before becoming the CEO of Lazarus Services, CW 3 owned a lab in Mississippi, which was in the Novitas MAC.  CW 3 stated that in the summer of 2018, SATARY approached him/her about purchasing the lab, explaining to CW 3 that Palmetto had recently issued changes that had crippled Clio Labs's business.  CW 3 stated that SATARY was looking for a lab in the Novitas region because its rules allowed "family only" testing.  SATARY ultimately did not purchase CW 3's lab.

56.     Instead, records obtained through grand jury subpoenas and search warrants establish that SATARY purchased Performance Labs, which was also in the Novitas region. Specifically, according to records obtained pursuant to grand jury subpoena, the money from Medicare reimbursements for Performance Labs' claims was deposited into an account in the name of Performance Labs at Bank of New York Mellon.  Individuals 5 and 6 were the signatories on the account.  According to records obtained pursuant to a grand jury subpoena, on or about October 4, 2018, an account in the name of Performance Labs was opened at Grand South Bank in South Carolina.  The signatories on the account were SATARY, Individual 3, and a third individual. Beginning in or around October 19, 2018, virtually all of the money deposited into the Performance

17

Labs account at Bank of New York Mellon was almost immediately transferred to the Performance Labs account at Grand South Bank. Between October 2018 and April 2019, approximately $43 million was transferred from the Bank of New York Mellon account to the Grand South Bank account. Of this $43 million, at least approximately $21 million was transferred to a personal account at Bank of America held in the name of SATARY's relative, Individual 3. On or about December 31, 2018, Performance Labs submitted an updated Medicare enrollment document. The document listed Individual 3 as the owner of Performance Labs.

57.     CW 3 also told federal law enforcement about the mechanism by which SATARY used to drive volume at Clio and Performance Labs. According to CW 3, SATARY relied on companies and individuals, like Individual 2 and Company 4, who used telemarketing and telemedicine to obtain DNA samples and D.O.s. SATARY paid illegal kickbacks and bribes to those companies and individuals in exchange for the referrals. Specifically, CW 3 stated that Individual 2 told him/her that Individual 2 owned durable medical equipment companies that ran television and internet advertisements. These advertisements touted the provision of back and knee braces to Medicare beneficiaries at little or no charge. Medicare beneficiaries, lured by this promise, called in to a call center to request the equipment, and were asked to provide their Medicare and other personal information.

58.     CW 3 stated that Individual 2's call center employees, who were not licensed medical professionals, concluded this call by asking whether the beneficiary had a personal or family history of any type of cancer. If a beneficiary noted any history of cancer—personal *or* family—the beneficiary was offered a "free" hereditary cancer screening test, and was told that the test would be paid for by Medicare. If this "free" test was accepted, the beneficiary's contact and Medicare information were then transferred to a telemedicine company, Company 6, owned

by Individual 2's business partner, Individual 7.  After the telemedicine doctor signed the authorization, a DNA collection kit containing cotton swabs and a specimen bag were sent to the beneficiary in a pre-addressed, pre-paid package.  Beneficiaries were asked to swab the inside of their cheek, deposit the DNA sample in the specimen bag, and mail all of the above back to Lotus Health.

59.     Federal agents have corroborated CW 3's statements through consensually monitored calls conducted with Individual 2 and through a search warrant executed on Individual 2's email account.  In addition, between January 2017 and the present, bank records obtained through grand jury subpoena show that Clio Labs, Performance Labs, or other entities controlled by SATARY have paid Company 4 approximately $3.9 million.

60.     In addition, in or around August 20, 2019, federal agents interviewed Doctor 1. The interview was not protected by a proffer letter.  Doctor 1 explained s/he had been contacted by Individual 7 to perform telemedicine consultations.  Doctor 1 stated s/he would receive an email in his/her email account from Individual 7's email account with an attachment for and order for either durable medical equipment or a CGx test.[5]  Each form was pre-filled and only needed to be signed by the doctor.  Doctor 1 stated s/he spent 2-3 minutes on each order, reading them and clicking on the document to affix his/her signature to the documents.  Doctor 1 admitted that s/he never saw tests results, was not treating the beneficiaries for cancer or any cancer symptoms, and did not have any doctor-patient relationships with any of the beneficiaries.  In exchange, Doctor 1 received $20-$30 for each file s/he reviewed.  According to Medicare data, between 2018 and 2019, Doctor 1 approved CGx tests for 1,142 beneficiaries for whom Performance Labs submitted a claim to Medicare.  Performance Labs billed approximately $22 million for the tests, of which

---

[5] Doctor 1 stated s/he also received orders for another type of genetic test called pharmacogenetics testing, or "PGx" testing.

Medicare paid $6.4 million.

Lazarus Services

61.     Lazarus Services was formed under the laws of Delaware on or about March 16, 2016, and registered in Louisiana in or around June 2016.  Its initial owners were a group of individuals with no known association with SATARY.  Lazarus Services received its Medicare reimbursements into an account in the name of Lazarus Services located at Frost Bank.  On or about December 6, 2018, a new account in the name of Lazarus Services was opened at Hancock Whitney Bank.  The signatories on the account were CW 3 and Individual 3.  On or about January 2, 2019, Lazarus Services submitted an updated Medicare enrollment document, identifying Individual 3 as the owner of Lazarus Services.  On or about August 27, 2019, Lazarus Services's records on file with the Louisiana Secretary of State were updated to name Individual 3 as the sole manager of the company.

62.     As noted, CW 3 was the interim CEO of Lazarus Services.  CW 3 told law enforcement agents that s/he has never met with, spoken with or seen Individual 3.  Instead, all directives to CW 3 regarding the business operation of Lazarus Services come from SATARY, and CW 3 understands SATARY to be the true owner of Lazarus Services.

63.     According to Medicare data, in 2018, Lazarus Services submitted approximately $261,000 in claims to Medicare for CGx billing.  Between January and June 2019, Lazarus Services submitted approximately $9.3 million in claims to Medicare, of which $2.3 million was paid.  70% of the claims were ordered by physicians who had never billed Medicare for an office visit with the beneficiary.

64.     CW 3 told agents that since in or around late July 2019, SATARY instructed his staff that billing and testing of CGx samples should be shifted from Performance Labs to Lazarus

Services.  After SATARY issued that directive, CW 3 stated, hundreds of CGx samples began being shipped to Lazarus Services.  Many of the samples had paperwork or labels on them indicating that the samples were from Performance Labs.  CW 3 stated that an employee of SATARY's instructed CW 3 and his/her employees to change the labels and paperwork to labels and paperwork for Lazarus Services.  CW 3 stated that the doctor's orders accompanying the samples delivered from Performance Labs to Lazarus Services indicated that the tests were ordered by telemedicine doctors.

65.     Medicare data corroborates CW 3's statements.  According to Medicare claims data, the billing for Performance Labs decreased from approximately $28 million in one week during the week of July 14 to approximately $17 million the week of September 8, 2019.  Lazarus Services increased from approximately $1.6 million in billing the week of July 14 to approximately $4.5 million the week of September 8, 2019.

66.     CW 3 asked an employee s/he knew to be close to SATARY why the shift from Performance Labs to Lazarus Services was occurring.  The employee responded that SATARY told him/her that Performance Labs had billed over $100 million in a short period of time, but did not have the lab testing equipment necessary to actually perform that volume of CGx tests.  Instead, Performance Labs was sending the CGx tests out to a third-party lab, known as a "reference" lab, for the tests to be run.  CW 3 stated that the employee explained that SATARY was concerned about an inspection at Performance Labs by regulators or other authorities that would show it did not have the proper machines.  As a result, SATARY wanted to close Performance Labs down before it could be investigated.  CW 3 stated that the employee told him/her that SATARY had instructed that the samples be shipped to Lazarus Services, and be billed out of Lazarus Services.  SATARY also ordered that the labels on the samples be changed from Performance Labs to

Lazarus Services before being sent out to the reference lab for testing.

67.     Federal agents interviewed beneficiaries for whom Lazarus Services had billed CGx testing to Medicare. Each confirmed that they had never seen or spoken with the doctor who ordered the CGx test, and that they agreed to take the test after receiving some kind of marketing pitch about the test. For instance, Beneficiary E.G. told federal agents that s/he received a telemarketing call regarding CGx. S/he agreed to receive the kit in the mail. E.G received the kit, provided a DNA sample, and sent it back to the return address on the shipping label. E.G. told agents that s/he had never been diagnosed with cancer, nor had anyone in his/her family had cancer. Rather, E.G. was simply curious to see if s/he was susceptible to cancer. E.G. did not recall receiving test results for the test, and did not discuss the test results with his/her doctor. E.G. did not recognize the name of the doctor who authorized the test, and never spoke to a doctor before or after receiving the test. E.G. said that if s/he had known the test would cost Medicare thousands of dollars, s/he would have hung up the phone immediately. Lazarus Labs submitted $14,847 in claims for genetic testing for E.G., of which $6,983 was paid.

68.     Similarly, Beneficiary C.G. told agents s/he had a friend, Individual 8, who sold Medicare Part C insurance plans. Individual 8 came to C.G.'s house one day. Individual 8 told C.G. about a genetic screening test that Medicare paid for at no cost. C.G. agreed to take the tests, and provided a sample to Individual 8. C.G. never spoke to a doctor about the test before or after providing the sample. C.G. did not recognize the name of the doctor who authorized the test. C.G. did get results from the lab, but s/he never discussed them with his/her primary care physician. Lazarus Labs submitted $14,847 in claims to Medicare for C.G.'s tests, of which $6,983 was paid. C.G. said s/he would not have taken the test if s/he had known it was so expensive.

CW 4

69.     CW 4 was a marketer for the SATARY LABS who, as stated above, is cooperating with the investigation.  CW 4 stated that s/he met SATARY before 2017, when CW 4 owned a substance abuse rehabilitation facility in Florida.  CW 4 stated that before owning the SATARY LABS, SATARY owned labs in Florida that performed urine toxicology screenings.  CW 4 stated SATARY paid him/her in exchange for sending his/her facility's urine toxicology screenings to SATARY's lab.  CW 4 told agents that s/he later turned to CGx testing, and had contracts with Clio and Performance Labs, through SATARY, in which the labs paid him/her between 35 and 45 percent of the monthly net revenue of any "specimens" that were processed by Clio Labs or Performance Labs, and for which Clio Labs or Performance Labs was paid through "billings from the applicable government healthcare program."  The contracts between Clio Labs, Performance Labs and CW 4 further provided that CW 4 would "receive an over-ride commission of 5% (five percent) of monthly Net Revenue for accounts introduced to [CLIO or Performance Labs] . . . ." These other accounts were known as "downlines."   In or around June 2019, federal agents conducted a consent search of the computer of another marketer who worked with Clio Labs. Federal agents recovered contracts between Clio Labs and marketers with the same language as that described by CW 4 from the computer.

Alpha Medical Consulting and Elite Labs

70.     Alpha Medical Consulting was incorporated under the laws of the State of Georgia on or about January 3, 2018.  Individual 9 was listed as the incorporator, CEO, CFO and Secretary of Alpha Medical Consulting.  On or about December 2018, Alpha Medical Consulting opened an account at SunTrust.  Individual 9 was the sole signatory of the account.  On or about February 15,

2019, Alpha Medical Consulting opened an account at PNC Bank. Individuals 9 and 10 were the signatories on the account.

71.     Elite Labs was incorporated under the laws of the State of Georgia on or about July 10, 2017. Individuals 11 and 12 were listed as being the officers of the company. On or around March 28, 2018, Elite Labs opened an account at PNC Bank. Individuals 11 and 12 were the signatories on the accounts. On or around September 27, 2017, Elite Labs submitted an application to become a Medicare provider. Between 2018 and 2019, Elite Labs billed $10 million to Medicare for CGx testing, constituting 92% of all the billing it submitted to Medicare in that timeframe. 99.67% of the claims were ordered by physicians who had never submitted a claim to Medicare for performing an office visit with the beneficiary. In my training and experience, I know that this is an indication that the doctor who ordered the CGx test was a telemedicine doctor or other doctor who did not actually see or treat the beneficiary.

72.     According to CWs 3 and 4, the purpose of Alpha Medical Consulting was to pay marketers so that the SATARY LABS do not pay the marketers directly.[6] According to CW 3, the SATARY LABS transferred Medicare reimbursements to Alpha Medical Consulting, who then paid the marketers. According to records obtained through grand jury subpoena, between 2018 and 2019, the Elite Labs account at PNC Bank received approximately $11.1 million from Performance Labs. $10.74 million of the money was then transferred to Alpha Medical Consulting. Performance Labs also paid at least approximately $10.5 million directly to Alpha Medical Consulting. From there, Alpha Medical Consulting then transferred the money to various marketing groups, including Company 4. According to CWs 3 and 4, SATARY was the true owner of both Alpha Medical Consulting and Elite Labs.

---

[6] CWs 3 and 4 also understand that Alpha Medical Consulting has some responsibility for billing for the SATARY LABS.

73.     On or about July 16, 2019, CW 4 visited Clio Labs with a device capable of making visual and audio recordings.  During the visit, CW 4 recorded a conversation s/he had with Individual 13.  In the recording, Individual 13 stated s/he was "the CEO of Clio and 360."  Based on my investigation, I know that 360 Laboratories is another laboratory controlled by SATARY. CW 4 asked whether samples are going to be sent to Lazarus Services.  Individual 13 replied that "It doesn't matter, we're all the same lab.  Whether it's Performance, Pathway [another lab controlled by SATARY] . . . ."  CW 4 asked if it is all the "same ownership, management." Individual 13 replies, "more or less, different investors, but we work around it."

74.     On or about July 29, 2019, CW 3 made a consensually recorded phone call with an officer of Alpha Medical Consulting.  The officer explained how Alpha Medical Consulting disguised the kickbacks it paid marketers who referred CGx tests and doctor's orders to the SATARY LABS.  The officer explained that Alpha Medical Consulting paid marketers based on "work hours."  For example, s/he said, marketers are paid $200 per hour for marketing efforts.  In reality, however, this is simply a way to disguise the kickbacks.  As the officer explained, if a marketer sends in a CGx sample for a beneficiary with a personal history of cancer, the marketer invoices Alpha Medical Consulting for 9 hours of work.  At $200 per hour, that is $1,800 for one CGx sample.  For beneficiaries with only a family history of cancer, Alpha Medical Consulting will be invoiced for 6 hours of work, and for PGx tests, invoiced 2 hours.  In the officer's words, "So we will back into the invoice."  The officer explained that s/he "already know[s] there's undercover people out there," so when she is "vetting" a new marketer, "what are billable hours for, I don't answer that."

## PROBABLE CAUSE TO SEARCH THE TARGET LOCATION

75.     Based on this investigation, there is probable cause to believe that evidence of the

25

above-described crimes exists in the information stored at the premises controlled by Interactive

Technology Services. Specifically, as part of his cooperation, CW4 consented to the government

obtaining his/her email account. A review of the email account identified an email referencing a

portal that doctors could use to review pending tests and test results. The website for the portal

was https://performance.iatserv.com. A review of publicly available information determined that

the website was owned by Interactive Technology Services.

76.     On September 16, 2019, federal agents served a preservation letter to Interactive

Technology Services for all information relating to Performance Labs. That day, Interactive

Technology Services acknowledged receipt of the request.

77.     On October 4, 2019, an attorney representing Interactive Technology Services

contacted government counsel, confirming that Performance Labs maintained an account with

Interactive Technology Services, and that Interactive Technology Services had preserved records

relating to Performance Labs. In subsequent communications, counsel for Interactive Technology

Services confirmed that Clio Labs, Alpha Medical Consulting and Elite Labs also had accounts

with Interactive Technology Services, and that Interactive Technology Services preserved records

relating to those entities as well.

78.     Interactive Technology Services also, through counsel, confirmed that for each

account listed above, it maintained four types of record databases, as follows:

      a.   "IAL" Database:[7] This database retains all doctor's orders, accessions,[8] patient

           information, information regarding sales representatives, lists of usernames and

---

[7] "IAL" stands for "InterActive Lab," a proprietary software developed by Interactive Technology Services that runs the database and user platforms.
[8] Accessioning is the process of recording and logging a laboratory's receipt of a patient sample. It involves data-entry of information relating to the sample, such as the name of the patient, the type of sample and test to be performed, the date of the sample was collected, the date the sample was delivered to the laboratory, the name of the doctor ordering the sample, biographical information of the patient and, in some cases, insurance information.

passwords, and documents identifying the source of particular genetic samples (by doctor, clinic or sales representative);

b.  Logging Database:  This database contains activity logs regarding changes made to the databases, including identifying the users making changes within the IAC database;

c.  IAL Dashboard Database: This database contains information relating to claims submitted by labs to various insurance companies;

d.  Documents Folder:  This database contains scanned documents uploaded by users of the databases, such as doctor's orders and finalized patient results.

**RETENTION OF INFORMATION FOR AUTHENTICATION**

79.     In anticipation of litigation relating to the authenticity of data seized pursuant to the warrant, the government requests that it be allowed to retain a digital copy of all seized information authorized by the warrant for as long as is necessary for authentication purposes.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

80.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Interactive Technology Services to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

81.     I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that from in or around January 2017, and continuing through the present, in Orleans Parish, in the Eastern District of Louisiana and elsewhere, SATARY, through Lazarus Services, Clio Labs, Performance Labs, Alpha Medical Consulting and Elite Labs, violated Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and/or Wire Fraud); Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay and Receive Healthcare Kickbacks); Title 42, United States Code, Section 1320a-7b (Offering and Paying Kickbacks Involving a Federal Health Care Program); and Title 18, United Section Code, Section 1956(h) (Conspiracy to Commit Money Laundering).

82.     Further, I submit that there is probable cause to believe that evidence, fruits and instrumentalities of these crimes, as described above and in Attachment B, are located on computer systems in the control of Interactive Technology Services.  Because the warrants will be served on Interactive Technology Services who will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the request warrant at any time of day or night.

83.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Victoria Buono
Special Agent
U.S. Department of Health and Human Services
Office of Inspector General

Subscribed and sworn to before me on this _____ day of February, 2020.

HONORABLE JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF LOUISIANA

29

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information stored on computer servers located at a premises owned, maintained, controlled, or operated by Interactive Technology Services, LLC ("Interactive Technology Services"), a company headquartered at 11380 Southbridge Parkway, Suite 234, Alpharetta, Georgia, and relating to information associated with accounts maintained by the following entities:

    a.  Clio Laboratories, LLC ("Clio Labs");

    b.  Performance Laboratories, LLC ("Performance Labs");

    c.  Alpha Medical Consulting, Inc. ("Alpha Medical Consulting"); and

    d.  Elite Medical Labs, Inc. ("Elite Labs").

## ATTACHMENT B

### Particular Things to be Seized

I.      **Information to be disclosed by Interactive Technology Services, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Interactive Technology Services, LLC ("Interactive Technology Services"), regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or information that have been deleted but are still available to Interactive Technology Services, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Interactive Technology Services is required to disclose the following information to the government for each account or identifier listed in Attachment A:

        a.      The InterActive, or "IAL," database, including but not limited to records relating to doctor's orders, accessions, patient information, information regarding sales representatives, lists of usernames and passwords, and documents identifying the source of particular genetic samples (by doctor, clinic or sales representative);

        b.      The logging database, including but not limited to activity logs regarding changes made to the databases, including identifying the users making changes within the IAC database;

        c.      The IAL dashboard database, including but not limited to records relating to claims submitted by labs to various insurance companies;

        d.      The documents folder, including but not limited to scanned documents uploaded by users of the databases listed above, such as doctor's orders and finalized patient results.

Provider is hereby ordered to disclose the above information to the government within 14 days of service of this warrant

## II.     Information to be Seized by the Government

For the time period January 1, 2017 to the present, all information that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and/or Wire Fraud); Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States and to Pay and Receive Healthcare Kickbacks); Title 42, United States Code, Section 1320a-7b (Offering and Paying Kickbacks Involving a Federal Health Care Program); and Title 18, United States Code, Section 1956(h) (Conspiracy to Commit Money Laundering), specifically, information pertaining to the following matters:

a.      Records, information, and communications relating to genetic tests;

b.      Records, information, and communications relating to doctor's orders for genetic tests;

c.      Records, information, and communications relating to patients who received genetic tests, including but not limited to test results;

d.      Records, information, and communications relating to the referral of genetic tests, including but not limited to records, information and communications tracking the number, volume and sources of such referrals, including referrals from sales representatives;

e.      Records, information, and communications relating to the sources of genetic tests, including the location, doctor, clinic or sales representative from which genetic tests were received;

f.      Records identifying usernames and passwords associated with accounts in the name of Clio Labs, Performance Labs, Alpha Medical Consulting, and Elite Labs;

g.      Activity logs from logging databases;

h.    Documents uploaded to documents folders relating to genetic tests; and

i.    Records relating to the submission of claims to Medicare for genetic testing.

## ADDENDUM TO ATTACHMENT B

With respect to law enforcement's review of the information seized pursuant to this warrant, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized information (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized information and the information and materials contained in them, as set forth in this Attachment B.

If law enforcement determines that all, some, or a portion of the information or materials in the seized information contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team will: (1) cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.